## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## FOR A SEARCH WARRANT

I, Ryan S. Burke, depose and state as follows:

## AGENT BACKGROUND

1.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since October 2012. I am currently assigned to the FBI's New Hampshire Major Offender Task Force ("NHMOTF") where I am tasked with investigating violent criminals, gang members, and significant drug traffickers throughout the state. As part of the NHMOTF, I work alongside law enforcement officers from various local, state, and federal agencies throughout the state of New Hampshire. I am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

2.      Throughout my career, I have led and/or been involved with investigations of drug distribution, violent crimes, and other offenses. My investigations have included the use of the following investigative techniques: physical surveillance; handling of cooperating sources and witnesses; exploitation of cellular, social media, and Internet Protocol ("IP") based communications data; execution of search and seizure warrants; wire, electronic, and oral wiretaps; and the execution of arrest warrants. Based on my training, experience, and information provided to me by other law enforcement officers, I am familiar with the modus operandi used by individuals engaged in the commission of various criminal offenses, such as those related to acts of violence, firearms, and controlled substances.

## PURPOSE OF AFFIDAVIT

3.      I submit this affidavit in support of an application for a warrant to search the following premises:

      a.      Unit 2 of the white house located at 461 Front Street in Manchester, New Hampshire ("Target Premises"). The house, depicted in Attachment A, has two units. As described in a real estate listing when it last sold in 2019, one of the units is on the upper floor and the other unit is on the lower floor. The house also has a basement with walk-out access and what appears to be an attic. The house has on-property parking in its driveway. This application seeks permission to search only Unit 2 and the areas on the curtilage of the property that are attributable to occupants of Unit 2 (vehicles, closets, storage areas, etc.).

4.      Based on the information contained herein, there is probable cause to believe that Target Premises, described in Attachment A, contains evidence, fruits, and instrumentalities as further described in Attachment B of the crimes of 21 U.S.C. §§ 841 & 846 [Distribution of Controlled Substances, Conspiracy to Distribute Controlled Substances] and 18 U.S.C § 922(g)(1) [Felon in Possession of Firearm or Ammunition] committed by Shannon Pellot-Sosa, Destinee Fitz, and others.

5.      The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, and information received from other law enforcement officers. I have not set forth every detail I or other law enforcement officers know about this investigation but have set forth facts that I believe are sufficient to evaluate probable cause as it relates to the issuance of the requested warrant.

**<u>PROBABLE CAUSE</u>**

6.      On March 31, 2022, a cooperating witness ("CW-1") informed law enforcement that Pellot-Sosa was a major distributor of methamphetamine and heroin within the greater-Manchester area. According to CW-1, Pellot-Sosa lived on Front Street in Manchester, New Hampshire across from a park and she drove a silver Honda Civic. CW-1 stated that Pellot-Sosa's supplier was recently arrested in Nebraska with 18 pounds of methamphetamine. CW-1 provided a link to a news article detailing the arrest.

7.     On April 4, 2022, law enforcement drove CW-1 to Front Street in Manchester and asked CW-1 to identify Pellot-Sosa's residence. CW-1 identifed her residence as the Target Premises, which is across from Blodget Park. CW-1 informed law enforcement that Pellot-Sosa typically enters the Target Premises using the front door. Present in the driveway that day was a silver Honda Civic as previously described by CW-1.

8.     Also on April 4, 2022, law enforcement directed a cooperating witness ("CW-2") to arrange the purchase of two ounces of methamphetamine from Fitz. In response to CW-2's request, Fitz stated, "The two zips[1] is gonna be 1450." When questioned about the increase in price relative to a previous controlled purchase wherein Fitz obtained methamphetamine for CW-2, Fitz replied stating, "Different connect[2], better shit." On the following day, Fitz adjusted the price to $1,200 after negotiations with CW-2 via iMessage.

9.     On April 5, 2022, CW-2 was searched by law enforcement and confirmed not to be in possession of controlled substances. CW-2 was subsequently provided a concealed audio/video recorder and followed by law enforcement to Fitz's residence located at 389 Front Street, Manchester, New Hampshire. Upon arrival, CW-2 called Fitz who instructed CW-2 to meet at a nearby convenience store. CW-2 was followed by law enforcement to the store.

10.     Soon after, Fitz exited her residence and walked to the Target Premises where law enforcement observed her meeting with Pellot-Sosa in the driveway. Pellot-Sosa then drove Fitz in Pellot-Sosa's silver Honda Civic to meet with CW-2 at the store. During their meeting, Fitz provided CW-2 with approximately 53.3 grams of a substance which field-tested positive for methamphetamine in exchange for $1,200. Based upon the aforementioned, I believe Fitz was

---

[1] Based on my training and experience, I know "zip" is a term commonly used by drug traffickers to refer to an ounce of controlled substances.
[2] Based on my training and experience, I know "connect" is a term commonly used by drug traffickers to refer to a source of supply.

referring to Pellot-Sosa when she informed CW-2 of the better "connect." I also believe Fitz was provided with the methamphetamine that she provided to CW-2 by Pellot-Sosa during the meeting in the driveway of the Target Premises.

11.     On April 8, 2022, law enforcement interviewed a cooperating defendant ("CD-1") who was arrested on March 9, 2022 in Nebraska with approximately 18 pounds of methamphetamine. CD-1 informed law enforcement that CD-1 had previously sold pound-quantities of methamphetamine to Pellot-Sosa. CD-1 described Pellot-Sosa's residence as an apartment inside of a house next to the Season Tickets sports bar in Manchester, New Hampshire – exactly where the Target Premises is located. Further, CD-1 stated Pellot-Sosa's apartment is on the left side of the end of the hallway on the second floor and that inside her bedroom, Pellot-Sosa stores narcotics in a built-in safe in the bottom of the nightstand.

12.     On April 13, 2022, law enforcement directed CW-2 to arrange the purchase of two ounces of methamphetamine from Fitz. Following their agreement, Fitz sent the following iMessage to CW-2, "So for the zips tomorrow can you try to get the money and get to me by 11 AM because my people have to takeoff to go to New York…" On the following day, at the direction of law enforcement, CW-2 modified the order of methamphetamine from two ounces to one ounce.

13.     On April 14, 2022, CW-2 was searched by law enforcement and confirmed not to be in possession of controlled substances. CW-2 was subsequently provided a concealed audio recorder and followed by law enforcement to Fitz's residence. Upon arrival, CW-2 met with Fitz inside her house and provided Fitz with $600. Fitz then directed CW-2 to wait down the street while Fitz went to obtain the methamphetamine from her supplier. They both then departed from Fitz's residence.

14.     Upon departure from her residence, Fitz rode her scooter directly to the Target Premises and entered the front door. After some time, Fitz exited the front door of the Target Premises and met with CW-2 across the street. During their meeting, Fitz provided CW-2 with approximately 25 grams of a substance which field-tested positive for methamphetamine in exchange for $600. Based upon the aforementioned, I believe Fitz obtained methamphetamine from Pellot-Sosa inside the Target Premises and then distributed it to CW-2.

15.     On April 15, 2022, CW-1 informed law enforcement that Pellot-Sosa commonly carries a black, 9mm concealable pistol in her waistband. Further, CW-1 stated Pellot-Sosa typically removes the firearm while driving and stores it somewhere inside her vehicle. Lastly, CW-1 stated that the front door of the Target Premises opens to a common hallway with a staircase that leads to the second floor. At the time, CW-1 had only met Pellot-Sosa in the common hallway.

16.     Later on April 15, 2022, law enforcement contacted UPS (United Parcel Service) to inquire about the locations where Pellot-Sosa may have received packages. UPS security personnel provided a screenshot containing details of a package with a manifest date of February 14, 2022 that was delivered to, "SHANNON PELLOT-SOSA, 461 FRONT ST FL 2, MANCHESTER NH 03102, UNITED STATES OF AMERICA."

17.     On April 18, 2022, a cooperating witness ("CW-3") informed law enforcement that a female living on Front Street in Manchester, New Hampshire distributes methamphetamine. CW-3 was driven by law enforcement to Front Street and CW-3 identified the Target Premises. The physical description of the female provided by CW-3 matched that of Pellot-Sosa. CW-3 was aware of the female's distribution because CW-3 had previously delivered methamphetamine to her at the request of a Massachusetts-based supplier. CW-3 estimated the delivery was in March 2022. CW-3 could not recall specifically which unit the female lived but recalled entering the front

door into a common hallway. CW-3 remembered seeing numerous shoe boxes containing US currency within the female's bedroom.

18.     On April 25, 2022, CW-1 informed law enforcement that CW-1 had recently met with Pellot-Sosa inside the Target Premises instead of their typical meeting in the common hallway. CW-1 confirmed the Target Premises was located on the second floor of the house and accessed by the interior staircase located in the front common hallway. CW-1 observed a significant amount of US currency and two handguns while inside the Target Premises with Pellot-Sosa.

19.     Based on a review of the criminal history for Pellot-Sosa, I know that she has been convicted of a crime punishable by imprisonment for a term exceeding on year. Additionally, Pellot-Sosa is an active parolee with the New Hampshire Department of Corrections. Therefore, she is prohibited from possessing firearms and ammunition

20.     For the reasons described above, I believe Pellot-Sosa lives in the Target Premises. I also believe Pellot-Sosa stores controlled substances, firearms, proceeds from the distribution of controlled substances, and other items of evidentiary value inside the Target Premises. Based on my training and experience, I also believe those items may be kept within Pellot-Sosa's vehicles located on the curtilage of the property.

**TRAINING AND EXPERIENCE RELATED TO DRUG EVIDENCE**

21.     Based upon my training and experience, as well as the collective knowledge and experience of other agents and officers in my office, I am aware that drug traffickers very often store controlled substances, firearms, and other tools of the drug trade in their homes, automobiles, garages or outbuildings on their properties, basements, or other places under their immediate control. I am aware that it is generally a common practice for drug traffickers to store their drug

inventory and drug-related paraphernalia including, but not limited to, scales, plastic baggies, wrapping material, paper or plastic bundles, and zip lock bags, in residences or other locations they access with frequency.

22.     It is generally a common practice for drug traffickers to maintain in hard copy or on other electronic devices, records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.

23.     Drug traffickers will commonly maintain records and documents which provide a paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual transactions. There are many reasons why an individual will generally maintain records for long periods of time. One reason is that the records will often seem innocuous because of their nature (e.g. financial, credit card and banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, computer hardware and software). Second, the individual may no longer realize he/she still possesses the records or may believe law enforcement could not obtain a search warrant to seize the evidence. Lastly, it is common for individuals to set aside or store such records, and because they generally have no immediate need for the records, they are often forgotten. To law enforcement, however, all these items may have significance and relevance when considered in light of other evidence.

24.     Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. Drug traffickers may also keep lists of customers, the cars they drive, and the phones they use in order to keep track of them. They may also collect court papers and other documents about customers who they believe may be cooperating with law enforcement authorities in order to protect themselves or attempt to intimidate potential cooperators.

25.     It is also a generally common practice for traffickers to conceal at their residences, or other places they access frequently, large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. Individuals who distribute controlled substances often use cash or readily transported assets which are used as cash equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because of the illegal nature of the transactions and to lessen the possibility of a financial paper trail. Additionally, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. They may also use banks and wire companies, both foreign or domestic, to launder and transfer funds to co-conspirators. They may also use shipping companies and keep records of shipments of goods bought with drug proceeds. Records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences. I know that drug traffickers sometimes purchase real estate with suspected drug proceeds. They may keep records of real estate transactions, money received from rental properties, and other such documents in their residences.

26.     Based on my training and experience, I know that individuals involved in the distribution of controlled substances attempt to hide the true identity of their residence and, further, employ methods of surveillance at such residence in order to evade law enforcement. Typically,

these individuals will maintain at their residence documents relating to the identity of the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. I know that drug traffickers often use storage units to store drug proceeds and that keys or records of these units may be kept in residences.

27.     Often, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

28.     Based on my training and experience, I know that drug traffickers typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments. I am aware that items such as cell phones and U.S. currency are often located in a residence or on an individual's person.

29.     Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items are usually maintained within their residence and sometimes on cell phones.

30.     It is common for individuals who are involved in the trafficking and distribution of controlled substances to store the records of those activities and proceeds of those activities in secure areas over which they have control such as safes, bags, locked drawers, briefcases, and duffel bags, among other locked containers.

31.     I know that individuals who distribute narcotics often utilize motor vehicles in order to obtain quantities of controlled substances from their source of supply for distribution. I also

know that individuals who are engaged in the distribution of controlled substances utilize motor vehicles in order to transport controlled substances to various locations in order to meet with and distribute controlled substances to potential drug purchasers.

32.     In addition to documentary evidence of financial and drug trafficking crimes, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at drug stash houses or at the dealers' own residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. I am aware that collections of cell phones have been found during drug trafficking search warrants of stash houses or residences that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

33.     As noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages. Actions such as internet searching or emailing (in addition to calling) and text messaging can now be performed from most cell phones. I know, based on my training and experience, that drug traffickers may use encrypted chat platforms like Whatsapp, Textnow, Facebook Messenger, and Instagram, to communicate with people in other countries (often countries from where drugs are brought into the United States) and

with people who are most cautious about law enforcement detection. Other applications like Venmo or Cashapp allow people to quickly make financial transfers to others and drug customers may use these methods to pay their sources of supply for drugs.

34.     In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking. Such numbers can confirm identities of particular speakers and the occurrence of certain events. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

35.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

          a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to

bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.  Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

13

e.  Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires

specialized tools and a controlled laboratory environment, and also can require substantial time.

f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment and can require substantial time. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

36.    Based on my training and experience, I believe that it is likely that the Target Premises will contain smartphones that can be unlocked via the use of a fingerprint or facial recognition in lieu of a numeric or alphanumeric password. In my training and experience, users of Apple devices that offer Touch ID or facial recognition often enable it because it is a more convenient way to unlock the device than by entering a passcode. It is also a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

37.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID or facial recognition enabled, and a passcode must be used instead, such as: (1) when a certain amount of time has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID or facial recognition recently and the passcode or password has not been entered in the last few days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID or facial recognition exists only for a short time.

38.     The passcodes that would unlock the devices found within the Target Premises are not known to law enforcement. Thus, it may be necessary to press the fingers of the user of the device to the device's Touch ID sensor or put the device's camera in front of the user's face in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock devices with the use of the fingerprints or facial profile of the user is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

## SEALING REQUEST

39.     I submit that there is reasonable cause to seal all documents related to this warrant because I believe premature disclosure may cause adverse results, including endangering the safety of cooperating witnesses or law enforcement agents, flight of Pellot-Sosa, Fitz, or others from prosecution, and destruction of evidence.

## CONCLUSION

40.     For all the reasons described above, I submit that there is probable cause to believe that evidence and fruits of the violations of 21 U.S.C. §§ 841 & 846 [Distribution of Controlled Substances, Conspiracy to Distribute Controlled Substances] and 18 U.S.C § 922(g)(1) [Felon in

Possession of Firearm or Ammunition] committed by Shannon Pellot-Sosa, Destinee Fitz, and others will be found by searching the Target Premises, further described in Attachment A. Based upon my training and experience I believe that the items set forth in Attachment B are commonly possessed by drug traffickers in their homes, on their cell phones, or in other places under their control and that those items are evidence of violations of the offenses being committed by Pellot-Sosa.

/s/ Ryan S. Burke
Ryan S. Burke, Special Agent
Federal Bureau of Investigation

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: __Apr 29, 2022__

Time: __11:17 AM, Apr 29, 2022__

HONORABLE ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**
**Premises to be Searched**

Unit 2 of the white house located at 461 Front Street in Manchester, New Hampshire ("Target Premises").

The premises to be searched also includes the areas on the curtilage of the property that are attributable to occupants of Unit 2 such as attached and unattached rooms, attics, basements, garages and storage areas, floor, wall and combination safes, lockers, briefcases, containers, trash areas, outbuildings, and vehicles; surrounding grounds and common areas/staircases; and the persons of adults associated with Unit 2 located at the premises at the time of the execution of this search warrant.



**ATTACHMENT B**
**Items to be Seized**

1.      Controlled substances including, but not limited to methamphetamine;

2.      Drug distribution paraphernalia including, but not limited to: scales, plastic baggies, wrapping material, paper or plastic bundles, blenders, zip lock bags, presses, cutting agents, and pill presses;

3.      Devices used to communicate with other drug traffickers or buyers including cellular telephones and pagers believed to be used by Shannon Pellot-Sosa and electronic equipment used for counter-surveillance such as scanners, police radios or monitors;

4.      Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, and address books;

5.      Large amounts of currency (exceeding $500) or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); prepaid debit cards and gift cards;

6.      Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, automobiles, motorcycles, trucks, or other vehicles purchased with cash or cash equivalents; credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

7.      Photographs, negatives, video tapes, films, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

8.      Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

9.      Weapons to include handguns, rifles, shotguns, hand crafted guns, explosive devices, etc., and ammunition in which there is no immediate appearance of legitimate use and of which may be used in conjunction with the distribution of controlled substances or possessed by a prohibited person;

10.     Indicia of possession of the place to be searched: including articles of personal property, such as personal identification, immigration documents, personal correspondence,

delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts, personal telephone and address books, and video tapes, tending to establish the identity of the person or persons in control of the areas to be searched;

11. Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers concerning Bradford Sargent or Jennelle Brown, business entities in which they are stakeholders, or co-conspirators; and

12. Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.

13. For the cellular telephones used primarily by Shannon Pellot-Sosa, I seek to search the telephones for:

   a. Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used in the distribution of controlled substances;

   b. Information associated with firearms, weapons, or ammunition;

   c. lists of customers and related identifying information;

   d. types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

   e. any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

   f. any information involving the travel to obtain controlled substances or the transportation of controlled substances;

   g. information reflecting contact or communication with coconspirators, the distribution of controlled substances to coconspirators, and the disposition of proceeds of controlled substances (including within messaging applications like WhatsApp, Snapchat, and Instagram stored on the phone);

   h. all bank records, checks, credit card bills, account information, and other financial records (including on financial applications like CashApp and Venmo);

   i. Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

During the execution of the search of the Target Premises described in Attachment A,

law enforcement personnel are authorized to press the fingers (including thumbs) of Shannon

Pellot-Sosa, if found at the Target Premises, to the fingerprint sensor of the devices respectively

believed to be used by her for the purpose of attempting to unlock the devices in order to search

the contents as authorized by this warrant. Compelling the unlocking of the devices using facial

recognition is also permitted.

As used above, the terms "records" and "information" include all of the foregoing items

of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that

can store data) and any photographic form.